**In the Matter of Greg Paul CAMP, II, Debtor.**

**Sand–Stone, Inc., Plaintiff,**

v.

**Greg Paul Camp, II, Defendant.**

**Bankruptcy No. 13–10797–WHD.**
**Adversary No. 13–1029.**

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

Signed July 8, 2014.

Kevin S. Dale, Hendrick, Phillips, Salzman & Flatt, PC, Thomas Rosseland, Bodker, Ramsey, Andrews, et al., P.C., Atlanta, GA, for Plaintiff.

J. Nevin Smith, Smith Conerly LLP, Carrollton, GA, for Defendant.

### *ORDER*

W. HOMER DRAKE, Bankruptcy Judge.

The above-styled adversary case comes before the Court on cross-motions for sum-

mary judgment filed by Sand–Stone, Inc. (hereinafter "Sand–Stone") and Greg Paul Camp, II (hereinafter "Camp"), requesting a determination as to whether certain alleged debts are not dischargeable pursuant to Section 523(a) of the Bankruptcy Code.[1] This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(1), as a core proceeding defined under 28 U.S.C. §§ 157(b)(2)(I) & (J). *See also* 28 U.S.C. § 1334.

### *Procedural History and Statement of Facts.*

Camp was the President, CEO, and sole owner of Camp Contracting, Inc. (hereinafter "CCI"). CCI contracted with Foxhall Investors, LLC (hereinafter "Foxhall") to act as general contractor on a project known as Legacy Lookout Pointe Pavilion located at Foxhall Resort & Sporting Club in Douglasville, Georgia (hereinafter the "Project"). Construction of the Project contemplated building and installing certain stone features on the premises. CCI's bid for the project estimated $23,200 for "stone." It did not specify whether that figure represented materials, labor, or both, though it did specify the sub-projects to be completed and the types of stone to be used for each. CCI used Sand–Stone as its supplier for the requisite stone.

The total amount to be paid to CCI on the Project was $629,509.00. However, the contract between CCI and Foxhall called for CCI to submit to Foxhall periodic progress payment applications to be based on actual work completed and expenses accrued. After review of said requests, Foxhall was to disburse funds to CCI. As part of his role of being the sole owner and officer of CCI, Camp was personally involved in seeking compensation on these progress applications on behalf of CCI.

Three payment applications included a line item for "stone." Again, these itemizations of "stone" are generic and do not delineate what specific costs the requested proceeds were to satisfy. The total requested for "stone" in these payment applications matched the total estimated in CCI's bid—$23,200. On Payment Application No. 11, dated July 25, 2011, CCI requested $26,900 ($8,000 for "stone") and received its full request. On Payment Application No. 16, dated August 29, 2011, CCI requested $24,475 ($7,500 for "stone") and received $19,525 of its total request. On Payment Application No. 17, dated September 5, 2011, CCI requested $64,183.39 ($7,700 for "stone") and received $25,111.67 of its total request.

On October 7, 2011, Camp, on behalf of CCI, sent Sand–Stone a letter acknowledging that CCI owed Sand–Stone a balance of $24,829.80 and expressing CCI's intent to recompense Sand–Stone in full, regardless of the outcome of future discussions between CCI and Foxhall. Subsequently, Sand–Stone received checks dated October 12, 2011 and November 18, 2011, totaling $4,500. No further compensation was distributed to Sand–Stone.

As a result of not having received full payment on the amounts owed to it, Sand–Stone filed a civil action in the Superior Court of Douglas County on June 14, 2012 against CCI, Camp, and Foxhall. The complaint alleged breach of contract, breach of open account *quantum meruit,* lien foreclosure, conversion, punitive damages and attorneys' fees. Camp and CCI timely answered the complaint.

On December 6, 2012, Sand–Stone served Camp and CCI with its first set of written discovery. Camp and CCI responded accordingly on January 8, 2013, but cautioned that each was still investi-

---

1. 11 U.S.C. § 101 *et seq.*

gating the matters inquired about and reserved the right to supplement or amend each's responses. Discovery officially ended on March 24, 2013 without supplementation. On March 28, 2013, Camp sought protection under the Bankruptcy Code, effectively staying that proceeding as it relates to him.[2]

This adversary proceeding was commenced on July 5, 2013. No discovery has taken place. After months of inactivity on the adversary docket, the Court issued an Order asking the parties to file a status report and advising that failure to do so would result in the case standing dismissed. In response, Sand–Stone filed its Motion for Summary Judgment (hereinafter "Sand–Stone's Motion").[3] Sand–Stone's Motion sought an Order finding that the debt of $20,329.80 [4] allegedly owed to it by Camp was nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6).

 Section 523(a)(4) states that a discharge under Chapter 7 of the Code "does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Section 523(a)(6) provides that a discharge under Chapter 7 of the Code "does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Sand–Stone's Motion alleged that Camp, on behalf of CCI, received payments for "stone" on three separate occasions from Foxhall, which he failed to remit back to Sand–Stone as the supplier. Thus, Sand–Stone contended that such actions constituted either embezzlement [5] or willful and malicious injury [6] on the part of Camp.

Camp responded with his Cross–Motion for Summary Judgment (hereinafter "Camp's Motion") [7] and brief supporting his own motion and in opposition to Sand–Stone's Motion. Camp's Motion initially charges that Sand–Stone's Motion was devoid of evidence showing that Camp personally owed the debt or that there was any actual evidence of intent to defraud or

---

2. *See* 11 U.S.C. § 362.

3. Accompanying Sand–Stone's Motion was the affidavit of Scott Hunt, the CEO and CFO of Sand–Stone.

4. The original demand in this adversary was for a nondischargeable debt of $24,829.80, and although Sand–Stone has not amended its complaint, it admitted to making an error by not accounting for the $4,500 in payments made to Sand–Stone from October through November of 2011.

5. Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.... Fraudulent appropriation requires an intent to deprive, which can be inferred from the conduct of the person accused and from the circumstances of the situation. *See In re Stone,* 1996 WL 34579205, at *3 (Bankr.

S.D.Ga. Jan. 29, 1996) (citing *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895)).

6. "[W]illful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights.... [M]alicious [means the injury] was wrongful and without just cause or excuse.... Willful means deliberate or intentional, referring to a deliberate or intentional act ... the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Smithey,* 2005 WL 6490601, at *3 (Bankr.N.D.Ga. Feb. 9, 2005) (internal citations omitted); *see also In re Kane,* 755 F.3d 1285, 1293–94 (11th Cir. 2014); *Maxfield v. Jennings (In re Jennings),* 670 F.3d 1329, 1334 (11th Cir.2012).

7. Accompanying Camp's Motion was the affidavit of Greg Paul Camp, II.

injure Sand–Stone. More importantly, however, the Motion sets forth facts, heretofore unknown to Sand–Stone—that other entities were also paid by CCI for "stone" related work.

Alexi's Construction, Inc. (hereinafter "Alexi's") provided labor for stone patios, chimneys, rock mantlets, and steps at the Project. Fortis Masonry (hereinafter "Fortis") contracted with CCI to "supply all labor necessary to provide installation of natural fieldstone and flagstone" and ultimately provided labor associated with stone columns, stone patios and porches, foundational walls, and stairs at the Project. Between the beginning of September and the end of November of 2011, Alexi's received $16,317 from CCI and Fortis received $3,000. When combined with the $4,500 received by Sand–Stone, CCI paid out $23,817, an amount approximating, but exceeding, what CCI requested from Foxhall for "stone."

Accordingly, Camp asserts that Sand–Stone's argument that Camp received money for "stone" and intentionally failed to remit it was predicated on the flawed assumption that Sand–Stone's stone was the only "stone" related expense incurred by CCI and requested in CCI's payment applications. According to Camp, the size and scope of the Project expanded from the initial contract, causing actual costs, including those for stone, to exceed the initial estimations. Because Camp distributed more funds than were requested for the purposes of "stone" related work and because the amounts requested were not exclusively for materials supplied by Sand–Stone, but instead included costs for both materials *and* labor, Camp contends that Sand–Stone's claim of embezzlement fails because there is no evidence to prove that Camp (1) appropriated funds entrusted to him which rightfully belonged to Sand–

Stone (2) for an unauthorized use or contrary to a use other than that to which such proceeds would have been entrusted (i.e. "stone" related expenses) and (3) that such an appropriation was accomplished with fraudulent intent or deceit. *See In re Stone*, 1996 WL 34579205, at *3 (Bankr. S.D.Ga. Jan. 29, 1996) (citing *In re Littleton*, 942 F.2d 551, 555 (9th Cir.1991)) (listing the three elements necessary for a finding of embezzlement).

Moreover, with regards to Sand–Stone's "willful and malicious" claim, Camp asserts that no uncontroverted facts have established that any portion of the monies received belonged to Sand–Stone or that the injury was malicious or that the requisite intent to injure was present. To the contrary, Camp believes that the evidence presented, primarily the October 7, 2011 letter, shows that it was *not* CCI's nor Camp's intent to have Sand–Stone financially harmed. Absent support for these elements, Camp believes that Sand–Stone cannot prevail, and that the Court should enter judgment for him as a matter of law.

On May 19, 2014, Sand–Stone filed its reply in support of its motion and response in opposition to Camp's Motion (hereinafter "Sand–Stone's Reply").[8] In Sand–Stone's Reply, Sand–Stone does not contest any of the factual revelations nor does it contest Camp's legal conclusions based on the application of those facts to the relevant law. In fact, Sand–Stone admits that had it "known and appreciated" that the Project had gone over budget and that CCI and Camp had disbursed all of the money received for "stone" related work to the three subcontractors/suppliers, "it would not have filed the instant action." *See* Pl.'s Reply Br. at 4, ECF No. 21. Sand–Stone solely rests its opposition to Camp's Motion (and Camp's objection to

---

**8.** Sand–Stone's Reply was supplemented by a sur-reply filed on June 17, 2014.

Sand–Stone's Motion) on the doctrine of "judicial estoppel." It is Sand–Stone's position that this "new" defense is wholly inconsistent with Camp's answers to interrogatories taken during discovery in the state court matter.[9] Additionally, Sand–Stone charges that Camp intentionally concealed these facts until it was convenient to reveal them, thus causing Sand–Stone to incur unnecessary costs and expenses in pursuing the current adversary proceeding. Accordingly, Sand–Stone believes that the Court should disregard these otherwise relevant facts, which give rise to Camp's defenses in this matter, under the equitable principle of judicial estoppel.

Because Sand–Stone has made a judicial estoppel analysis indispensable to its own position, as well as its opposition to Camp's position, the Court finds it imperative that it address this matter first.

### Judicial Estoppel

 The doctrine of judicial estoppel was derived for the purpose of protecting the "integrity of the judicial process" by operating to "prevent[ ] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Upon an extensive review of its application, our highest court noted several factors that typically inform a court's decision to employ the doctrine in a particular case:

> First, a party's later position must be "clearly inconsistent" with its earlier position. . . . Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750–51, 121 S.Ct. 1808 (8–0 decision) (internal citations omitted); *see also Jaffe v. Bank of America, N.A.,* 395 Fed.Appx. 583, 587 (11th Cir.2010) (reciting the same factors).

 Sand–Stone argues that these factors are nothing more than guidelines and that the Court should not feel "constrained" to observe them all, especially the factor regarding success in a prior proceeding. Although invocation of judicial estoppel resides solely with the discretion of the deciding Court, and despite the Supreme Court making it clear that these factors were not to "establish inflexible

---

**9.** Camp primarily denied owing a debt of any kind to Sand–Stone in the state court proceeding. Sand–Stone takes the position that this is inconsistent with Camp's current stance that he paid all monies received by CCI to "stone" related subcontractors and suppliers. Sand–Stone also takes issue with Camp's (and CCI's) omission of these payments to other "stone" related subcontractors/suppliers when asked (1) to "identify all persons . . . whom you believe have knowl-

edge of any of the facts and circumstances of this case;" (2) to state "[h]ow much money, if any . . . do you believe is owed to [Sand–Stone] and what statements, testimony, documents or other evidence support that contention;" and (3) to identify "any . . . evidence, including underlying facts," which support defenses of statute of limitations, estoppel, failure of consideration, injury by fellow servant, laches, waiver, accord and satisfaction, set-off, or release.

prerequisites" to its application, *see id.*, none of the cases that the Court has reviewed has disregarded these factors, and Sand–Stone has not directed the Court's attention to any case that would call for their abandonment. *See id.; Jaffe v. Bank of America, N.A.,* 395 Fed.Appx. 583 (11th Cir.2010); *Fetterhoff v. Liberty Life Assurance Co.,* 282 Fed.Appx. 740 (11th Cir. 2008); *Thompson v. Quarles,* 392 B.R. 517 (S.D.Ga.2008); *Hillis v. Equifax Consumer Serv.,* 237 F.R.D. 491, 510 (N.D.Ga.2006) ("Suffice it to say that the doctrine of judicial estoppel does not apply unless the party against whom it is invoked was *successful* in its assertion of its previous, inconsistent statement.") (emphasis added); *Scoggins v. Arrow Trucking Co.,* 92 F.Supp.2d 1372 (S.D.Ga.2000) (pre-*New Hampshire v. Maine* holding that the doctrine can "only be applied to preclude a party from asserting a position in a judicial proceeding which is *inconsistent* with a position previously *successfully* asserted by it in a prior proceeding") (emphasis added and in original); *S.J. Groves, & Sons Co. v. Fulton Cnty.,* 967 F.Supp. 501 (N.D.Ga.1999) (same).

An exhaustive analysis into the factors would prove an unnecessary waste of judicial resources.[10] Camp never successfully

asserted an inconsistent position in the state court matter. "[A] position has been successfully asserted when it has been accepted by the court." *S.J. Groves, & Sons Co. v. Fulton Cnty.,* 967 F.Supp. 501, 503 (N.D.Ga.1999) (citing *Konstantinidis v. Chen,* 626 F.2d 933, 939 (D.C.Cir.1980)); *see also Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1038 (2nd Cir.1993) (finding that the prior inconsistent statement must have been "adopted by the court in some manner"). The Superior Court never had any opportunity to adjudicate any issue in this matter, let alone rule in favor of Camp. "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little risk to judicial integrity." *New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Accordingly, the Court declines to judicially estop Camp from asserting these facts in this matter and from deriving a defense from those facts.

### Summary Judgment Standard

In accordance with Federal Rule of Civil Procedure 56 (applicable to bankruptcy under FED. R. BANKR.P. 7056), this Court will grant summary judgment only if "there is no genuine issue as to any material fact

10. In passing, the Court notes that it is unlikely that the factors not discussed are entirely in Sand–Stone's favor. Revelation of these facts appear to have been necessary to dispute elements that were heretofore not at issue: fraudulent or willful intent; malicious injury; ownership of the received proceeds; and contrary use of funds. Contrastingly, the previous charges seem to be based upon whether Camp (or CCI or Foxhall) owed money to Sand–Stone. Accordingly, they are not inconsistent, but newly revealed to combat different elements. Additionally, though Sand–Stone discusses how this lack of disclosure has caused it to spend time and money pursuing this matter, Sand–Stone fails to identify any "unfair advantage(s)" that Camp derived from the alleged secrecy or how the detriment

experienced by Sand–Stone was reciprocally unfair. Litigation costs both time and money, and often parties push litigation that cannot or does not succeed. There is always a financial risk associated with initiating and prosecuting a cause of action. In this case, both sides expended resources prosecuting these issues. Sand–Stone stated that had it known these additional facts, it would not have filed this action, but Camp had no way of knowing that. In fact, had he known Sand–Stone would drop any contest to his personal discharge upon a mere explanation, revelation would have been in Camp's best interest. It appears, then, that this failure to communicate has resulted in both sides facing a detriment, but the Court fails to see how either of them experienced an "unfair" detriment.

and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012). A fact is material if it might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party has the burden of establishing the right of summary judgment, *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir. 1982), and the Court will read the opposing party's pleadings liberally. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985). In reviewing cross-motions, the Court accepts the facts as stated in the pleadings and views them in the "light most favorable to the non-moving party on each motion." *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir.2012). The moving party must identify those evidentiary materials listed in Rule 56(c) that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* FED.R.CIV.P. 56(e). Once the moving party makes a *prima facie* showing that it is entitled to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that there is a material issue of fact which precludes summary judgment. *Celotex*, 477 U.S. at 324, 106

S.Ct. 2548; *Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir.1991).

### Sand–Stone's Summary Judgment Motion

Based on his response to Sand–Stone's Motion, and accompanying affidavit, and viewing the facts in the light most favorable to the defendant, Camp successfully demonstrated material issues of fact which preclude summary judgment in favor of Sand–Stone. Sand–Stone asserts embezzlement and willful and malicious conversion for its basis that Camp owes it debts which are nondischargeable in bankruptcy. As defined above, embezzlement requires appropriation of property rightfully belonging to another, as well as the existence of fraudulent intent. Moreover, embezzlement also requires a use of the appropriated property in a manner that is contrary to its entrustment. Similarly, willful and malicious conversion requires "unauthorized exercise of ownership" over property of another to the exclusion of that owner's rights, along with the requisite malice and intent. *In re Smithey*, 2005 WL 6490601, at *3 (Bankr.N.D.Ga. Feb. 9, 2005).

Camp's factual revelations create genuine issues of material fact. Assuming they are true, and Sand–Stone declines to contest their veracity, the facts are relevant to every element of both legal theories. Legitimately, Camp held funds on behalf of CCI that were to be used to pay for "stone" related work, both labor and materials, on the Project. He distributed all of these proceeds, plus some little extra, to three "stone" related subcontractors/suppliers, including Sand–Stone. Therefore, in regard to embezzlement, the facts call into question Sand–Stone's ability to establish: (1) Sand–Stone's claim to ownership of the funds; (2) a use other than the reason that said funds were entrusted; and (3) any form of intent to defraud

Sand–Stone. Likewise, as to willful and malicious conversion, the facts again challenge Sand–Stone's ownership over the funds and rebut both the maliciousness of the injury and the intent to harm.[11] Accordingly, these facts are material in that their application calls into question the outcome of Sand–Stone's claims under substantive law, and they create a genuine issue in that a reasonable jury, after considering them, would be inclined to return a verdict in Camp's favor.

### Camp's Cross–Motion for Summary Judgment

To the contrary, Sand–Stone has failed to demonstrate genuine issues of material fact that would preclude summary judgment in favor of Camp. Camp made declarations of fact, supported by an affidavit and exhibits, which Sand–Stone failed even to attempt to dispute. Sand–Stone relied solely on judicial estoppel, which the Court determined is inappropriate in this case. These facts defeat necessary elements of the claims against Camp, resulting in a *prima facie* showing that he is entitled to judgment as a matter of law. Sand–Stone was thus required to go beyond the pleadings and demonstrate a genuine issue of material fact. Because its subsequent pleadings failed to demonstrate such an issue, the Court finds that it must rule in favor of Camp.

### Conclusion.

After reviewing all filings in this matter and considering the facts in a light most favorable to the non-moving party on each motion, the Court concludes that Camp is entitled to judgment as a matter of law on all issues advanced in Sand–Stone's complaint which are the subject of these cross-motions for summary judgment. Accordingly, it is hereby

**ORDERED and ADJUDGED** that Sand–Stone's Motion for Summary Judgment is DENIED;

**FURTHER ORDERED and ADJUDGED** that Camp's Cross–Motion for Summary Judgment is **GRANTED;**

**FURTHERMORE,** as this Order resolves all issues within this adversary proceeding, the Clerk is authorized to close this case under its normal procedures, barring appeal to the District Court.

The Clerk is **DIRECTED** to serve a copy of this Order upon Sand–Stone, Camp, respective counsel, and the Trustee.

**IT IS ORDERED.**

---

11. The Eleventh Circuit has never taken the opportunity to instruct the lower courts on whether it favors a subjective or object standard for its "substantially certain to cause injury" component under the willful intent analysis of 11 U.S.C. § 523(a)(6), *see In re Kane*, 755 F.3d 1285, 1293 (11th Cir.2014); however, at best, Sand–Stone could satisfy only the less stringent, objective standard, as the record reflects an initial intention eventually to pay Sand–Stone, and nothing demonstrates that the Debtor actually knew that his actions were substantially certain to result in harm. Nevertheless, having shown an absence of both maliciousness and the essential elements of conversion, further review would be nothing more than an academic exercise.